FEDERAL DEPOSIT INSURANCE
CORPORATION, Plaintiff–
Appellee,

v.

BANK OF COUSHATTA, et al.,
Defendants–Appellants.

No. 90–4577.

United States Court of Appeals,
Fifth Circuit.

May 13, 1991.

John C. Deal, O. Judson Schaef, Emens, Hurd, Kegler & Ritter, Columbus, Ohio, James G. Bethard, Bethard & Davis, Coushatta, La., for defendants-appellants.

Gary Lindsay Newport, Sr. Atty., Patricia Riddick, Staff Atty., La. Office of Financial Institutions, Baton Rouge, La., for amicus curiae.

John A. Broadwell, Asst. U.S. Atty., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., Thomas L. Holzman, FDIC, Trial Cnsl. Sec., Washington, D.C., for plaintiff-appellee.

Before WISDOM, KING, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

The Federal Deposit Insurance Corporation issued a capital directive to the Bank of Coushatta and its directors (Board). After they failed to comply, the FDIC obtained an ex parte order from the district court to enforce the directive. The Bank and Board appeal from the order; they contend, pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq.*, and Fifth Amendment due process, that they were entitled to an agency hearing and judicial review in conjunction with issuance of the directive. We AFFIRM.

I.

Chartered by Louisiana,[1] the Bank is federally insured, subject to the Federal Deposit Insurance Act, 12 U.S.C. § 1811, *et seq.*, and FDIC rules and regulations. In July, 1989, it was operating under the FDIC capital forbearance program in an attempt to bring its capital to a minimum level. Under its second capital forbearance plan, the Bank had agreed to bring its primary capital ratio to 5.49% by year end. The FDIC determined that the Bank could not comply with the plan, because its loss classifications exceeded amounts projected for all of 1989. As a result, in July 1989, the FDIC issued a notice of intent, with preliminary findings of fact and conclusions of law, stating that the Bank's primary capital was lower than required by regulation and that the FDIC proposed to issue a capital directive requiring the Bank by December 31, 1989, to increase that capital by not less than $725,000 and to achieve ratios of primary and total capital to total assets of not less than 5.5% and 6.0% respectively.

Accompanying the notice was a letter to the Board, which discussed the financial condition of the Bank, the reasons for its deteriorating status, and the intent of a capital directive action.[2] Also enclosed was the report on the examination of the Bank conducted as of April 1989 by the FDIC and a state examiner.

Any response to the notice was due within 14 days after receipt and was to

state any basis for relief from the proposed CAPITAL DIRECTIVE, and may seek modification of its terms, or seek other appropriate relief. Such response shall include any information, mitigating circumstances, documentation, or other relevant evidence which supports the Bank's position, and may include a plan for attaining the minimum capital requirement.

By only a 1½ page letter in August 1989, the Board responded; it noted its efforts to find additional capital, its lack of financial capacity, and the weakened nature of the Louisiana economy, stating that "[t]he main reason for failure to achieve the goals in the Capital Forbearance Plan is loan losses and the deterioration of the parcels held as Other Real Estate." The Board did not dispute any of the FDIC's classifications of assets or its calculations. Nor did it submit any proposal for meeting the FDIC requirements, stating only that "[t]he Board believes it will have sufficient earning[s] to have a capital ratio in excess of 4% by year end, and will continue its efforts to find additional capital." The Board acknowledged the "capital deficiency" and requested modification of the capital forbearance plan in lieu of a capital directive.

The FDIC issued the directive in September 1989, with supporting findings of fact and conclusions of law and a cover letter to the Board. The Bank was directed (1) by December 31, 1989, to restore its ratio of primary capital to total assets to at least 5.5% and enhance that capital by at least $725,000; and (2) within 30 days, to submit

---

1. The Louisiana Office of Financial Institutions submitted an amicus brief in support of appellants.

2. The Board was asked to both acknowledge receipt of the letter and "advise that the letter was made a part of the minutes of the Board." This, and similar facts, bear on its assertion that it is not a proper party to the district court enforcement proceeding from which this appeal lies. See note 5, *infra.*

a plan for achieving the capital level. The directive stated that it was binding upon "the Bank [and] its directors," among others.

Because the Bank failed to comply, the FDIC filed a letter in May 1990, in the United States District Court in Louisiana, pursuant to 12 U.S.C. § 1818(i), requesting an order enforcing the directive against the Bank and Board. Attached to the letter was a Petition for Enforcement of Administrative Order, stamped filed on June 14, 1990. On July 13, 1990, the district court issued the requested ex parte order. The Bank, its officers and directors were ordered to comply with the directive and to submit a report within 30 days "setting forth in detail the manner and form in which Respondent has complied with the provisions of this Order. This Court shall retain jurisdiction ... for the purpose of entertaining any petition which ... [the FDIC] may make and entering further orders as may be necessary to enforce compliance with the terms of this Order." The Bank and Board filed an appeal from that order and a motion for stay pending appeal; the district court and this court denied the stay.

## II.

The FDIC's authority to issue capital directives is one of its regulatory tools for dealing with troubled banks. Most of these methods are set forth in 12 U.S.C. § 1818; however, authority for a directive is found in the International Lending Supervision Act of 1983 (ILSA), 12 U.S.C. § 3907, which provides in part:

(a)(1) Each appropriate Federal banking agency shall cause banking institutions to achieve and maintain adequate capital by establishing minimum levels of capital for such banking institutions and by using such other methods as the appropriate Federal banking agency *deems* appropriate.

(2) Each appropriate Federal banking agency shall have the authority to establish such minimum level of capital for a banking institution as the appropriate Federal banking agency, *in its discre-*

*tion, deems* to be necessary or appropriate in light of the particular circumstances of the banking institution.

(Emphasis added.) Moreover, failure to maintain the requisite capital "may be *deemed* by the appropriate Federal banking agency, *in its discretion,* to constitute an unsafe and unsound practice...." 12 U.S.C. § 3907(b)(1) (emphasis added).

If a bank fails to maintain the required capital, the agency may issue a directive:

(B)(i) Such directive may require the banking institution to submit and adhere to a plan acceptable to the appropriate Federal banking agency describing the means and timing by which the banking institution shall achieve its required capital level.

(ii) Any such directive issued pursuant to this paragraph ... shall be enforceable under the provisions of Section 1818(i) ... to the same extent as an effective and outstanding order issued pursuant to Section 1818(b) ... which has become final.

12 U.S.C. §§ 3907(b)(2)(B)(i) and (ii).

The above referenced § 1818(b) governs cease-and-desist proceedings. Cease-and-desist orders are issued only after an agency hearing, §§ 1818(b)(1) and (h)(1), and "become effective at the expiration of thirty days after the service of such order ... and shall remain effective and enforceable ..., except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court." 12 U.S.C. § 1818(b)(2). Such orders may be reviewed in a court of appeals within thirty days after service of the order. § 1818(h)(2).

And, § 1818(i), also referenced above in § 3907, provides:

The appropriate Federal banking agency may in its discretion apply to the United States district court ... for the enforcement of any effective and outstanding notice or order issued under this section, and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section no court shall have jurisdiction to affect by injunction

or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order.

 Accordingly, a capital directive may be enforced in the district court under § 1818(i). But, as also referenced above, the district court's jurisdiction is limited. "[S]ection 1818(i) ... evinces a clear intention that [the] regulatory process is not to be disturbed by untimely judicial intervention, at least where there is no 'clear departure from statutory authority.'" *Groos Nat'l Bank v. Comptroller of Currency,* 573 F.2d 889, 895 (5th Cir.1978) (citation omitted). Furthermore, the hearing requirements for cease-and-desist orders are not incorporated in the procedures for capital directives.

Section 3907 was enacted to provide "a stronger, unambiguous statutory directive to the regulators to strengthen banks' capital positions." H.R.Rep. No. 98–175, 98th Cong., 1st Sess. 45, reprinted in 1983 U.S. Code Cong. & Admin.News 1768, 1928.

> The [Senate Banking and Finance] Committee's amendment explicitly makes failure to maintain established capital levels an "unsafe and unsound practice...." The amendment requires regulators to demand that institutions below the required capital levels submit and adhere to an acceptable plan to achieve prescribed levels.

*Id.* at 1929.

Another congressional purpose behind § 3907 was in response to this court's decision in *First Nat'l Bank of Bellaire v. Comptroller of Currency,* 697 F.2d 674 (5th Cir.1983), where the portion of a cease-and-desist order requiring a capital ratio was set aside as not being supported by substantial evidence. *Id.* at 684–87. Congress was concerned that *Bellaire* "clouded the authority of the bank regulatory agencies to exercise their *independent discretion* in establishing and requiring the maintenance of appropriate levels of capi-

tal." S.Rep. No. 98–122, 98th Cong., 1st Sess. 16 (emphasis added).

> The Committee believes that establishing adequate levels of capital is properly left to the *expertise* and *discretion* of the agencies. Therefore, in order to clarify the authority of the banking agencies to establish adequate levels of capital requirements, to require the maintenance of those levels, and *to prevent the courts from disturbing such capital,* the Committee has provided a specific grant of authority to the banking agencies to establish levels of capital....

*Id.* (emphasis added).

The capital maintenance regulations define such terms as primary capital, secondary capital, total assets, assets classified loss and intangible assets. 12 C.F.R. § 325.2 (1990 ed.). They describe how the ratios are calculated, with the minimum capital requirement for "a bank" being ratios of total and primary capital to total assets of not less than the aforementioned 6% and 5.5% respectively. § 325.3.[3]

A bank's financial condition is determined through an examination process. Examiners appointed by the FDIC have authority to examine "any insured State nonmember bank ... whenever the [FDIC] determines an examination ... is necessary." 12 U.S.C. § 1820(b)(2). After a "thorough examination," the examiner is required to "make a full and detailed report of condition" to the FDIC. 12 U.S.C. § 1820(b)(5).

The examination may lead to a capital directive being issued. But, the regulations require the FDIC to first issue a notice of its intention to issue the directive; and the notice must include detailed data, such as the current total capital ratio and the basis upon which the ratio is calculated. 12 C.F.R. § 325.6(c)(1). The bank has 14 days to respond, including explaining why the directive should not issue and seeking

---

**3.** The Bank is classified as a "bank" under the regulations. "The term 'bank' means an FDIC insured, state-chartered commercial or savings bank that is not a member of the Federal Reserve System." § 325.2(2)(b). A "bank" is distinct from an "insured bank" under the regulations.

modification of its terms.[4]

After the bank responds, the FDIC issues a decision, explaining its determination whether to issue a directive. The directive may order the bank to achieve the minimum capital requirement by a certain date; to submit a plan for achieving the minimum capital requirement; or to take other action necessary to achieve the minimum capital requirement; or a combination of the above. § 325.6(c)(3). If a directive is to be issued, it may be served upon the bank with the final determination. *Id.*

The regulations then allow enforcement, as described above, in the same manner as for a final cease-and-desist order. Moreover, "[i]n addition to enforcement of the directive, the FDIC may seek ... penalties for violation of the directive against any bank, any officer, *director,* employee, agent, or other person participating in the conduct of the affairs of the bank, pursuant to 12 U.S.C. § 3909(d)." § 325.6(d)(1) (emphasis added).[5]

### A.

In response to the contention that the district court ex parte proceedings deprived the Bank and Board of a right to judicial review under the APA, the FDIC asserts that the decision to issue a capital directive is not reviewable, because it is committed to agency discretion by law. Likewise, in denying a stay pending appeal, the district court held that "whether ... to issue a capital directive is committed to the sole discretion of the FDIC and is, therefore, unreviewable under the [APA]. 5 U.S.C. § 701(a)(2)."

There is a presumption of reviewability. "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *see also Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 671, 106 S.Ct. 2133, 2136, 90 L.Ed.2d 623 (1986) (" 'Very rarely do statutes withhold judicial review.' ") (quoting legislative history of APA).

The APA's provisions for judicial review of final agency actions are contained in 5 U.S.C. §§ 701–706. Section 702 provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

Section 702, however, is limited by § 701(a). "[B]efore any review ... may be had, a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714 (1985). That section provides for judicial review, "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The distinction between subparts (1) and (2) in § 701(a) is that,

[t]he former applies when Congress has expressed an intent to preclude judicial review. The latter applies in different circumstances; even where Congress has not affirmatively precluded review, re-

---

**4.** As the Bank was advised, the response "shall include any information, mitigating circumstances, documentation or other relevant evidence which supports its position, and may include a plan for attaining the minimum capital requirement." § 325.6(c)(2).

**5.** Section 3907 only speaks to issuing a directive to "a banking institution." 12 U.S.C. § 3907(b)(2)(A). However, enforcement of the directive against only the "bank" would be meaningless. For example, a "bank" can not raise capital and otherwise seek to ensure that a capital directive is complied with; that is accomplished by its board and officers, among others. Accordingly, the district court's order

was directed to the Bank and Board. They assert that there was no "indication that the individual defendants [the Board] would be named as parties in any litigation," because the Board members "were not parties to the capital directive." The Board was clearly on notice of the directive. Two cover letters, discussed *supra,* were addressed to it; and the response to the notice of intent was through the Board's counsel. Furthermore, the subsequently issued directive states, pursuant to the regulation described above, that it is "binding upon the Bank, its directors, officers, employees, agents, successors, assigns, and other persons participating in the affairs of the Bank."

view is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decision-making to the agency's judgment absolutely.

*Heckler*, 470 U.S. at 830, 105 S.Ct. at 1655.

In looking first to determine whether review is precluded under § 701(a)(1), we note that there is no statutory prohibition against it; but neither is there any procedure for it—unlike final cease-and-desist orders. Furthermore, no review is allowed in the district court enforcement proceeding; as discussed above, its jurisdiction is limited to the "power to order and require compliance." § 1818(i)(1).

■ As noted, § 3907 was enacted, in part, in response to judicial interference with capital requirements, as in *Bellaire*. Examination of the statutory scheme and its legislative history supports a congressional intention to preclude review. However, in the absence of an express prohibition, there is a "strong presumption that Congress did not mean to prohibit all judicial review of [the] decision." *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Id.* (quoting *Abbott Labs*, 387 U.S. at 141, 87 S.Ct. at 1511). Because the standard for finding preclusion of review under § 701(a)(1) is a difficult hurdle to cross, we turn instead to the applicability, *vel non*, of § 701(a)(2) (agency action committed to its discretion).

In *Heckler*, the Supreme Court engaged in its first concentrated interpretation of § 701(a)(2) and noted that its construction was complicated by the "tension between a literal reading of § (a)(2), which exempts from judicial review those decisions committed to agency 'discretion,' and the primary scope of review prescribed by § 706(2)(A)—whether the agency's action was 'arbitrary, capricious, or an *abuse of discretion.*'" 470 U.S. at 829, 105 S.Ct. at

1654 (emphasis in original). Initially, the Court discussed *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), where, in addressing whether an agency decision was subject to judicial review, it stated that the § 701(a)(2) exception was very narrow, to be applied only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* at 410, 91 S.Ct. at 820 (quoting S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). *Heckler* adopted the *Overton Park* reasoning and found it was not at odds with abuse of discretion review under § 706:

> [R]eview is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ... can be taken to have "committed" the decision-making to the agency's judgment absolutely. This construction avoids conflict with the "abuse of discretion" standard of review in § 706—if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for "abuse of discretion."

470 U.S. at 830, 105 S.Ct. at 1655. The reasoning in *Heckler* is helpful for our analysis; but, *Heckler* involved a refusal to take enforcement action. The Court held that such refusal was "generally committed to an agency's absolute discretion," because it "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* at 831, 105 S.Ct. at 1655. The Court further noted that "when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers." *Id.* at 832, 105 S.Ct. at 1656 (emphasis in original).

In *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), the Court addressed § 701(a)(2) in the context

of an agency's decision to act, thereby expanding its *Heckler* analysis. In *Webster*, a discharged CIA employee contended that his termination violated the APA because it was, among other things, in violation of the procedures required by law and the CIA regulations.[6] The statute in issue allowed termination of a CIA employee whenever the director "shall *deem* such termination necessary or advisable in the interests of the United States." *Id.* at 600, 108 S.Ct. at 2052 (quoting § 102(c) of the National Security Act, 50 U.S.C. § 403(c)) (emphasis in original). The Court first emphasized that § 701(a)(2) "requires careful examination of the statute on which the claim of agency illegality is based," *id.*, and held:

> This standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review. Short of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests, we see no basis on which a reviewing court could properly assess an Agency termination decision. The language of § 102(c) thus strongly suggests that its implementation was "committed to agency discretion by law."
>
> So too does the overall structure of the National Security Act.

*Id.* In ruling, the Court relied on the legislative history of the National Security Act, which evidenced the Act's "extraordinary deference" to the CIA director and his decisions to terminate individual employees. *Id.* at 601, 108 S.Ct. at 2052.

▮ The FDIC contends that the legislative history and language of ILSA demonstrate that Congress likewise intended capital directives to be unreviewable. Relying on *Webster*, it asserts that the repeated use of the word "deem" in the statute evidences deference and forecloses review.

Section 3907 uses the terms "deem" or "discretion" in almost every provision: the FDIC may cause institutions to maintain adequate levels of capital by such methods as it "deems appropriate," § 3907(a)(1); it can establish minimum levels of capital which it "in its discretion, deems to be necessary or appropriate in light of the particular circumstances of the banking institution," § 3907(a)(2); the failure of a banking institution to maintain its capital "may be deemed by the appropriate Federal banking agency, in its discretion, to constitute an unsafe and unsound practice," § 3907(b)(1).[7] And, the legislative history, discussed *supra*, also supports such a construction. For example: "The Committee believes that establishing adequate levels of capital is properly left to the *expertise* and *discretion* of the agencies ... and to prevent the courts from disturbing such capital, the Committee has provided a specific grant of authority to the banking agencies to establish levels of capital...." S.Rep. No. 98–122 at 16 (emphasis added).

The legislative history and language of the statute do not leave a court with a meaningful standard against which to judge the agency's exercise of its discretion. Accordingly, we conclude that even if review is not prohibited pursuant to § 702(a)(1), it is precluded pursuant to § 702(a)(2), because issuance of a directive is committed to the FDIC's discretion.

### B.

▮ It is contended that the procedures for issuance of a capital directive violate Fifth Amendment due process and can be saved only by incorporation of APA hearing provisions. As discussed in *Webster*, even if agency action is committed to its discretion by law, judicial review of constitutional claims is still available, unless congressional intent to preclude such re-

---

**6.** Several constitutional violations were also alleged, including Fifth Amendment procedural due process, as discussed *infra* in Part II.B.

**7.** As discussed *infra*, issuance of a capital directive is one of the least intrusive methods available to the FDIC when dealing with a troubled bank. Its purpose is for prompt action, in

order for banks to come into compliance before more drastic measures are required, such as issuance of a cease-and-desist order or termination of a bank's insured status. *See* 12 U.S.C. § 1818(a)–(e). These more drastic means provide for an APA hearing and judicial review.

view is clear. 108 S.Ct. at 2053. We do not find such intent. Moreover, the FDIC concedes that unreviewability does not extend to the issue of whether there is a "constitutional right to a full hearing on the record prior to issuance of a directive," and instead asserts that the procedures provide due process.

■ The Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Matthews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). It "is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334, 96 S.Ct. at 903 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Likewise, what due process may require "in dealing with one set of interests ... may not be required in dealing with another set of interests." *Arnett v. Kennedy*, 416 U.S. 134, 155, 94 S.Ct. 1633, 1645, 40 L.Ed.2d 15 (1974). Accordingly, *Matthews* adopted a three factor test:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens

that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903.

### 1.

■ For purposes of applying this test, we must review, once again, the earlier described procedures. If the FDIC makes an initial determination that a directive should issue, it notifies the bank of its intent to do so and provides detailed underlying data. The July 1989 letter accompanying the notice enclosed a copy of the April 1989 examination prepared by an FDIC examiner in conjunction with a state examiner. The letter noted that the condition of the Bank remained "severely distressed with the examination reflecting a further decline in capital" and discussed other problems that the examiners had discovered. A copy of the proposed capital directive was enclosed.

The letter advised, as provided in the regulations, that the Bank could file a written response within 14 days, including providing supporting data, explaining why the directive should not issue or seeking a modification of its terms or other relief. Failure to file a written response constitutes waiver of the opportunity to do so and is consent for the directive's issuance. § 325.6(c)(6).

The regulations required the FDIC to consider the Bank's response and "serve upon the [Bank] a written determination addressing the [Bank's] response and setting forth the FDIC's findings and conclusions in support of any decision to issue or not to issue a directive. The directive may be issued as originally proposed or in modified form." 12 C.F.R. § 325.6(c)(3). The regulations further provide that upon a change in circumstances, a bank may request reconsideration of the directive's terms and "may propose changes in the plan under which it is operating to meet the minimum capital requirement." § 325.6(c)(4).

The decision to issue a capital directive is made only after an evaluation of a bank's capital structure, the regulations providing that

[t]he FDIC is required to evaluate capital before approving various applications by banks. The FDIC also must evaluate capital, as an essential component, in determining the safety and soundness of banks it insures and supervises.

12 C.F.R. § 325.1. The decision comes only after, among other things, an extensive examination by a trained bank examiner. As discussed, a bank is given a copy of the examination report with the notice of intent. In response, it may submit any evidence which supports its position. The response postpones issuance. And, the FDIC considers the response in making its determination.

The Bank does not contend that the FDIC did not follow its procedures. Instead, it asserts that it is not allowed to dispute the underlying facts which make up the FDIC's determination that the Bank is not in compliance. However, the notice of intent states that the Bank could include "other relative evidence" which supported its position. The Bank could have responded to the notice with documentation that the FDIC's data was either in error or had changed. There is no limit on what a bank can say in its response. The Bank did not take full advantage of its opportunity to respond. Nor did it challenge any of the data provided it, including the report of examination. Needless to say, its failure to take such opportunity is not due to an inherent deficiency in the procedures.

Although the FDIC procedures do not involve a hearing, with testimony and examination before a neutral officer, they do allow notice and ample opportunity to respond before a directive issues. The directive issued in September 1989; enforcement was not sought until May 1990. Furthermore, under the regulations, once a directive has issued, a bank may request the FDIC to reconsider its terms and propose changes to any plan under which it is operating.

2.

■ We analyze the three *Matthews* factors against this procedural backdrop. First, the private interest affected is obvi-

ously substantial. For example, the directive requires a capital infusion of $725,-000; and the regulations allow contempt sanctions for noncompliance.

Turning to the second factor, we find that the risk of an erroneous deprivation of the Bank's interests through the procedures described above is minimal. It had an opportunity to respond to the notice of intent, including to the examination report. The need for additional procedural safeguards is speculative. The Bank has not shown that evidence it could present at a hearing could not have been presented in response to the notice. While there is obvious advantage to the presence, and participation, of a neutral decision maker and examination of witnesses, especially cross-examination, it is not significant enough here to warrant a hearing prior to issuance of a directive. The decision to issue comes only after several deliberative steps and thorough documentation, including a bank examination, presentation of the examination report to a bank and consideration of any written response.

Third, the government's interest in having capital directives promptly implemented is significant. The benefits from a directive would be weakened greatly, if not lost, if additional procedures, including a hearing, were necessary. For example, if a hearing were required, the directive would be delayed; by the time the matter was resolved, a bank's financially troubled status, requiring issuance of a directive, may have deteriorated substantially.

The relationship of a capital directive to other regulatory tools the FDIC can employ in dealing with a troubled bank is relevant to this analysis. Other actions, such as a cease-and-desist order and termination of a bank's insured status, are much more intrusive. For example, a cease-and-desist order gives the FDIC authority "to place limitations on the activities or functions of an insured depository institution or any institution-affiliated party." 12 U.S.C. § 1818(b)(7). The institution may be required to restrict its growth; dispose of any loan or asset involved; rescind agreements or contracts; employ qualified offi-

cers or employees; or "take such other action as the banking agency determines to be appropriate." 12 U.S.C. § 1818(b)(6)(B)–(F). These actions provide for an APA evidentiary hearing and judicial review.

Therefore, we conclude that the capital directive procedures satisfy Fifth Amendment due process.[8]

### III.

Accordingly, the order of the district court is

AFFIRMED.

---

**8.** Because we find that the FDIC's actions are committed to agency discretion by law, we need not address the Bank's contention that the agency findings are not supported by substantial evidence; it claims that because there was no hearing, then, *ipso facto*, there can be no substantial evidence.