**UNITED LIBERTY LIFE INSURANCE COMPANY, Plaintiff–Appellant,**

**v.**

**Timothy RYAN, Director, Office of Thrift Supervision, United States Department of the Treasury; Resolution Trust Corporation; Federal Deposit Insurance Corporation; Pinnacle West Capital Corporation; Richard Snell; Henry B. Sargeant Jr.; Karl Eller; Pamela Grant; John R. Norton III; Donald N. Soldwedel; Maurice R. Tanner; Keith L. Turley; Douglas J. Wall; and Faye Widenmann, Defendants–Appellees.**

No. 91–3933.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 3, 1992.

Decided Feb. 17, 1993.

Michael H. Siegler (argued and briefed), Mariann Yevin, (briefed), Ross, Jung, Phillipps & Carson, Cincinnati, OH, for plaintiff-appellant.

Elizabeth Baringhaus Mattingly, Office of the U.S. Atty., Cincinnati, OH, Aaron B. Kahn, David H. Enzel (argued and briefed), Office of the Dept. of Treasury, Thrift Supervision, Washington, DC, Joseph H. Vahlsing, Cors, Bassett, Kohlhepp, Hallo-

ran & Moran, Cincinnati, OH, E. Scott Dosek (argued and briefed), Kutak, Rock & Campbell, Phoenix, AZ, John T. Downing (argued and briefed), Washington, DC, Nancy A. Stratta, Snell & Wilmer, Phoenix, AZ, Robert A. Pitcairn, Jr., Katz, Teller, Brant & Hild, Cincinnati, OH, Richard A. Derevan (briefed), Snell & Wilmer, Irvine, CA, James R. Condo (argued), Snell & Wilmer, Phoenix, AZ, for defendants-appellees.

Before: GUY and RYAN, Circuit Judges; and CONTIE, Senior Circuit Judge.

RYAN, Circuit Judge.

This case is concerned primarily with the powers possessed by the federal entities charged with managing the nation's troubled savings and loan institutions. In 1989, Congress responded to the growing crisis in the savings and loan industry by passing legislation that created and empowered new supervisory entities to deal with the institutions, as well as granting new powers to existing agencies. This appeal requires us to consider the extent to which federal courts may exercise jurisdiction over claims against the implicated federal entities. In addition, we must address the district court's exercise of personal jurisdiction over defendants located outside the forum state.

Plaintiff United Liberty Life Insurance Company appeals from the district court's grant of summary judgment for all defendants. The federal defendants are Timothy Ryan, in his capacity as Director of the Office of Thrift Supervision (OTS); the Resolution Trust Corporation (RTC); and the Federal Deposit Insurance Corporation (FDIC). The private defendants are Pinnacle West Capital Corporation and its officers and directors. The dispute arose from a plan to save a failing savings institution, MeraBank, that was owned by Pinnacle West.

United Liberty claims that the federal defendants violated its due process rights and contract rights, and breached an indenture agreement, and that the private defendants violated civil RICO laws as well as state and federal securities laws.

Although this appeal presents numerous substantive issues, we dispose of the case on jurisdictional grounds. We conclude that the district court lacked jurisdiction to consider United Liberty's claims against the federal defendants. We do not decide, however, whether the district court would have jurisdiction over the private defendants, and remand the case for further proceedings.

## I.

### A.

Before tracing the history of this litigation, we briefly describe the parties. Plaintiff United Liberty is an Ohio insurance company. Defendant OTS is a federal regulatory body, established by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989). When it enacted FIRREA, Congress eliminated the Federal Savings and Loan Insurance Corporation (FSLIC) and the Federal Home Loan Bank Board (FHLBB), and created OTS to assume the regulatory functions of these two bodies. OTS was vested with the power to regulate the savings and loan industry. 12 U.S.C. §§ 1462a, 1463.

Defendant FDIC is also a federal regulatory body. Under FIRREA, it assumed the insurance functions of FSLIC and FHLBB, and is charged with the duties of regulator, insurer, and receiver of banking institutions. 12 U.S.C. § 1811 *et seq.* Defendant RTC succeeded the FSLIC as the assistor, conservator, and receiver of troubled savings institutions.

Defendant Pinnacle West, formerly known as AZP Group, Inc., is an Arizona savings and loan holding company. The individual defendants were, at the times relevant to this case, officers or directors, or both, of Pinnacle West.

In addition to the defendants who are parties to this appeal, Pacholder Associates, Inc. was originally named as a defendant. Pacholder was the agent of, and investment advisor for, United Liberty.

## B.

In December 1986, AZP, later to become Pinnacle West, acquired all the stock in MeraBank, a federally chartered savings bank. At the time of the acquisition, Mera-Bank was Arizona's third largest financial institution. Before acquiring control of MeraBank, AZP had to comply with conditions prescribed by the FHLBB. These conditions were contained in a document styled "Stipulation of AZP Group, Inc.". In it, AZP stipulated to FSLIC as follows:

As long as it controls MeraBank, AZP will cause the net worth of MeraBank to be maintained at a level consistent with that required by [relevant banking regulations] and, as necessary, will infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement.

The stipulation concluded with the following statement: "These stipulations are provided solely for the benefit of the FSLIC and the FHLBB, and may not be enforced by any other party."

The existence of the stipulation was published in AZP's 1986 Form 10–K filed with the Securities and Exchange Commission. The form stated:

The Company has stipulated to the FSLIC that, as long as it controls Mera-Bank, the Company will cause the regulatory capital of MeraBank to be maintained at the level required by applicable regulations and, as necessary, will infuse sufficient additional equity capital to effect compliance with such requirement.

In addition, United Liberty alleges that the capital infusion requirement was described in the annual reports of Pinnacle West.

In August and October 1987, United Liberty, acting through its agent, Pacholder, purchased two subordinated MeraBank debentures with a total value of $1 million, and due in 1996. The debentures were issued pursuant to an indenture dated June 30, 1984, between MeraBank and Valley National Bank of Arizona. The debentures were not insured by any federal agency. The president of United Liberty attested that United Liberty would not have purchased the debentures in the absence of AZP's commitment to the financial integrity of MeraBank.

In 1989, MeraBank fell below minimum capital requirements. In December 1989, Pinnacle West, the successor to AZP, and OTS, acting as the successor in interest to FSLIC and FHLBB, entered into a settlement agreement. OTS agreed to release Pinnacle West from its obligations under the stipulation if Pinnacle West delivered to MeraBank a cash payment of $300 million plus interest, and a note of $150 million plus interest.

In January 1990, OTS placed MeraBank in receivership and appointed RTC as receiver. OTS also authorized a charter for a new savings institution, MeraBank Federal Savings Bank, and appointed the RTC conservator of the new institution. At about the same time, the RTC, as receiver of MeraBank, transferred substantially all of MeraBank's assets to MeraBank Federal; however, MeraBank Federal did not assume any of the obligations owed to the holders of the MeraBank debentures, including, of course, United Liberty.

In March 1990, Pinnacle West delivered to RTC, as receiver of MeraBank, approximately $465 million in a cash payment and a note. At this time, RTC and OTS released Pinnacle West and its directors and officers from any obligations under the stipulation and from any other obligation to infuse capital into MeraBank. Also in March 1990, the FDIC separately released Pinnacle West from any claims the FDIC might have against it.

## C.

In February 1991, United Liberty filed an amended complaint in the United States District Court for the Southern District of Ohio. It contained seven counts, which we summarize as follows:

—Count One alleged that United Liberty purchased the debentures in reliance on the stipulation. By releasing Pinnacle West from its obligations under the stipulation, OTS, RTC, and FDIC substantially impaired the value of the deben-

tures and thus took United Liberty's property without due process of law in violation of the Fifth Amendment.

—Count Two alleged that the private defendants issued false annual reports on which purchasers of the debentures relied. This conduct amounted to a pattern of racketeering, violating the civil provisions of RICO, 18 U.S.C. § 1962(b).

—Count Three alleged that the private defendants engaged in fraud in selling the debentures.

—Count Four alleged that United Liberty was a third-party beneficiary of the stipulation, and that the federal defendants' actions in releasing Pinnacle West from its obligations without the consent of United Liberty was a breach of the stipulation.

—Count Five alleged that RTC and OTS breached the indenture when they transferred the assets of MeraBank into Mera-Bank Federal while failing to transfer MeraBank's obligations under the indenture.

—Count Six alleged a violation of the Arizona Consumer Fraud Act.

—Count Seven alleged negligence on the part of Pacholder in its role as a fiduciary.

United Liberty sought actual and punitive damages against the private defendants in the approximate amount of $7.2 million. It also sought a declaration that the actions of the federal defendants violated United Liberty's rights under the Fifth Amendment; requested a permanent injunction forbidding such future violations; and sought an order "in the nature of a mandamus" directing the federal defendants to require Pinnacle West to honor its capital infusion obligation to MeraBank under the stipulation. Importantly, United Liberty does not seek monetary damages from the federal defendants.

The private defendants moved to dismiss United Liberty's complaint for failure to state a claim, Fed.R.Civ.P. 12(b)(6), and for lack of personal jurisdiction. The three federal defendants filed separate motions to dismiss or, in the alternative, for summary judgment. The district court dismissed defendant Pacholder and, as a result, Count Seven did not survive.

In due course, the district court granted summary judgments in favor of OTS, RTC, FDIC, and the private defendants as well, thus disposing of the entire case. *United Liberty Life Ins. Co. v. Ryan*, 772 F.Supp. 366 (S.D.Ohio 1991). United Liberty appeals and presents numerous issues. We think three are dispositive:

1. Whether any federal statute waives sovereign immunity thus permitting the district court to exercise jurisdiction over United Liberty's claims for relief against OTS and FDIC in their capacities as federal regulatory agencies?

2. Whether the district court possessed jurisdiction to consider United Liberty's claims for relief against RTC in its capacity as receiver for MeraBank?

3. Whether the district court possessed personal jurisdiction over the private defendants, despite their lack of minimum contacts to the forum state, under section 27 of the Exchange Act, 15 U.S.C. § 78aa.

## II.

### A.

In granting summary judgments in favor of the federal defendants, the district court necessarily exercised jurisdiction over United Liberty's claims. The federal defendants challenge this exercise of jurisdiction. In response, United Liberty contends that none of the federal defendants' challenges to jurisdiction are properly preserved for review because the federal defendants did not cross-appeal from the district court's exercise of jurisdiction.

We agree that the federal defendants did not file any notices of cross-appeal as to their jurisdictional issues. Instead, they raised the jurisdictional issues in their briefs in response to United Liberty's opening brief.[1]

---

**1.** We note that the better practice would have been for the federal defendants to cross-appeal

from the district court's decisions on jurisdic-

■ United Liberty is correct that issues not preserved for review are not ordinarily addressed by the court of appeals. Nevertheless, this general rule is subject to the familiar exception that the parties can neither waive objections nor consent to subject matter jurisdiction. *In re Wolverine Radio Co.,* 930 F.2d 1132, 1137–38 (6th Cir.1991). This court's threshold duty in every case is to determine whether it has subject matter jurisdiction over the controversy before it, whether or not the parties have preserved for appeal a challenge to the court's jurisdiction. *Id.*

We shall, therefore, consider the federal defendants' claim that the district court and this court are without subject matter jurisdiction over the claims against the federal defendants.

### B.

In its claims against the federal defendants, United Liberty asserted subject matter jurisdiction on two grounds: 1) the general federal question jurisdiction statute, 28 U.S.C. § 1331, and 2) the federal government's waiver of sovereign immunity under the Administrative Procedures Act (APA), 5 U.S.C. § 702.

■ The Supreme Court has held that "the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983). The doctrine of sovereign immunity serves as a bar to suit against the United States unless the government has explicitly waived sovereign immunity. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953 (1976). "A waiver of sovereign immunity must be clear, express, and unambiguous; it cannot be implied from vague language." *Ohio v. United States Dep't of Energy,* 904 F.2d 1058, 1059 (6th Cir.1990), *rev'd on other grounds,* — U.S. ——, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992).

United Liberty asserts that the APA waives the government's sovereign immunity, thereby permitting United Liberty to challenge the OTS and FDIC decisions not to enforce the stipulation against Pinnacle West. The APA provides, in relevant part:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency ... acted or failed to act ... shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. The statute mandates that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The statute also establishes the applicable standard for review of agency action. The standards, as they are relevant to this case, are as follows:

The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [and]

(B) contrary to constitutional right, power, privilege, or immunity....

5 U.S.C. § 706.

Those provisions are subject, however, to certain exceptions found in section 701(a). That section provides that judicial review over agency action

applies ... except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

5 U.S.C. § 701(a).

Both FDIC and OTS argue that the section 701(a) exception to the APA waiver of sovereign immunity applies because the

tion, thus allowing for a more complete briefing of the issues.

agency "action" of which the plaintiff complains—the decisions by FDIC and OTS in early 1990 not to enforce the terms of the stipulation against Pinnacle West—was an administrative enforcement "action ... committed to agency discretion by law," and thus not subject to judicial review.[2]

In *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Supreme Court discussed, for the first time, the section 701(a)(2) limitation on judicial review of agency actions. It initially noted the difficulty of interpreting the two exceptions of section 701(a), sections (a)(1) and (a)(2), in light of section 706(2)(A). The Court resolved the tension as follows:

> The former [§ (a)(1)] applies when Congress has expressed an intent to preclude judicial review. The latter [§ (a)(2)] applies in different circumstances; even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely. This construction avoids conflict with the "abuse of discretion" standard of review in § 706—if no judicially manageable standards are available for judging how and when an agency should exercise its discretion then it is impossible to evaluate agency action for "abuse of discretion."

*Heckler*, 470 U.S. at 830, 105 S.Ct. at 1655. The Court then held that there is no judicial review when the only agency "action" is a decision to refuse enforcement orders. The Court noted that in cases involving refusal to take enforcement steps,

> the presumption is that judicial review is not available.... [A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.

*Id.* at 831, 105 S.Ct. at 1655. The Court reasoned:

> [An] agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise.... The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.

*Id.* at 831–32, 105 S.Ct. at 1655–56.

■ In this case, two different sections of savings and loan regulations are implicated. The first deals with the regulation of federal savings associations, 12 U.S.C. § 1464. That section grants OTS the power to require savings associations to maintain adequate capital, using any methods OTS determines to be appropriate. 12 U.S.C. § 1464(s)(1)(B). One method is the issuance of a capital directive, which shall be enforced in the same manner as FDIC directives are enforced. 12 U.S.C. § 1464(s)(4) (referencing 12 U.S.C. § 1818). The relevant provision of 12 U.S.C. § 1818 provides:

> The appropriate Federal banking agency may *in its discretion* apply to the United States district court ... for the enforcement of any effective and outstanding notice or order issued under this section, and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order.

12 U.S.C. § 1818(i)(1) (emphasis added). Thus, under 12 U.S.C. §§ 1464(s)(4) and 1818(i)(1), the decision to issue a capital directive is committed to the agency's discretion.

The second relevant section is 12 U.S.C. § 1467a which establishes the regulatory powers OTS may exercise over savings and

---

**2.** FDIC contends that it did not, in fact, take any action. Nevertheless, for the purposes of this

loan holding companies.[3] It grants to OTS the authority to issue injunctions and cease and desist orders against savings and loan holding companies. 12 U.S.C. §§ 1467a(g)(4), (5)(A). The section also provides:

> The Director [of OTS] *may in the Director's discretion* apply to the United States district court [for] ... the enforcement of any effective and outstanding order issued under this section, and such court shall have jurisdiction and power to order and require compliance therewith. Except as provided in subsection (j) of this section, no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order.

12 U.S.C. § 1467a(g)(5)(B) (emphasis added). Subsection (j) provides that "[a]ny party aggrieved by an order of the Director under this section may obtain a review of such order...." 12 U.S.C. § 1467a(j). Subsection (j) does not permit any party aggrieved by the director's refusal to issue a compliance order to seek review of that decision.

We realize that the statutes we have referenced do not explicitly preclude judicial review of agency decisions not to take enforcement actions, such as enforcement of the stipulation involved in this case. They do, however, commit enforcement decisions to the discretion of the director of OTS.

■ It follows, we think, that the director's decision not to enforce the stipulation in this case is an "agency action ... committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and one that is not subject to judicial review under the APA. This accords with the decision in *FDIC v. Bank of Coushatta*, 930 F.2d 1122 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 170, 116 L.Ed.2d 134 (1991), where the court considered a challenge by a bank seeking judicial review of the FDIC's decision to issue a capital directive that required the bank to increase its capital. The court concluded that it lacked jurisdiction to review the decision itself, although it also concluded that it had jurisdiction to consider the procedure by which the FDIC decided to issue the directive.[4]

*Coushatta* interpreted 12 U.S.C. § 1818(i) which, as noted above, contains language very similar to 12 U.S.C. § 1467a(g)(5)(B). The *Coushatta* court reviewed the statute empowering the FDIC to issue capital directives and concluded:

> The legislative history and language of the statute do not leave a court with a meaningful standard against which to judge the agency's exercise of its discretion. Accordingly, we conclude that even if review is not prohibited pursuant to § 70[1](a)(1), it is precluded pursuant to § 70[1](a)(2), because issuance of a directive is committed to the FDIC's discretion.

*Coushatta*, 930 F.2d at 1129. Although *Coushatta* only discussed the capital directives issued by FDIC, its reasoning applies to OTS as well, because OTS possesses analogous powers over savings and loan institutions. 12 U.S.C. § 1464(s)(4)(B). We note that the facts in *Coushatta* present a closer case than is presented here, since in *Coushatta* FDIC had actually issued a capital directive; here, OTS elected not to issue such a directive.

Therefore, we conclude that the decisions taken by OTS and FDIC not to enforce the stipulation are agency actions not subject to judicial review under the APA. Consequently, the APA does not waive the sovereign immunity of OTS or FDIC for their decisions not to enforce the stipulation, and therefore does not provide a basis for the district court to exercise subject matter jurisdiction over United Liberty's claims against OTS and FDIC.

---

issue, we can assume that FDIC took action.

**3.** The federal defendants do not discuss the relevant provisions of this section.

**4.** Here, United Liberty has *not* challenged the procedure used by the federal defendants, but rather the result—the decisions not to enforce the stipulation but rather to enter into the settlement agreement.

**1328**

### C.

■ United Liberty also claims that the district court possessed jurisdiction under the FIRREA. FIRREA is the law that transferred the functions of FSLIC and FHLBB to the newly-created OTS.

OTS argues that FIRREA is not a source of subject matter jurisdiction for United Liberty's suit because United Liberty is not a savings association, and the only provisions of the FIRREA that permit suits against the OTS specify that suits may be maintained by savings associations. Indeed, a close review of FIRREA reveals that the only provisions that arguably would permit United Liberty to sue OTS under the terms of FIRREA specifically state that the director of the OTS shall be subject to suit by any federal savings association. One section, 12 U.S.C. § 1464(d)(1)(A), provides, in part, that "the Director [of OTS] shall be subject to suit (other than suits on claims for money damages) by any Federal savings association or director or officer thereof with respect to any matter under this section...." A different section, 12 U.S.C. § 1464(d)(2)(E), provides for judicial review of a savings association's challenge to the director's appointment of a receiver.

We conclude that since both provisions specifically limit judicial review to suits by a federal savings association or its directors or officers, and since United Liberty is neither, but merely an investor, the FIRREA does not confer subject matter jurisdiction for United Liberty's claims against OTS.

### D.

■ United Liberty challenges RTC's action in its capacity as receiver in transferring the assets of MeraBank to MeraBank Federal.

RTC's posture in this litigation differs from that of OTS and FDIC. OTS and FDIC are both federal regulators, and we consider our authority to review their actions under standards applicable to regulators. The RTC, on the other hand, is not acting as a regulator in this suit but rather as a receiver for MeraBank and conservator of MeraBank Federal. Although the RTC raises three standing issues, we find one dispositive.

RTC argues that Congress gave it broad powers to manage savings institutions over which it has been appointed receiver. Included in these powers is a prohibition against certain judicial action. The relevant provision provides:

Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver.

12 U.S.C. § 1821(j). This provision was originally applied to the FDIC. However, when Congress created the RTC in 1989, it established that the RTC shall have the same powers as possessed by the FDIC under section 1821. 12 U.S.C. § 1441a(b)(4).

In *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989), the Court interpreted a very similar provision that applied to FSLIC. The similar provision, 12 U.S.C. § 1464(d)(6)(C), provides that no court shall "restrain or affect" the exercise of FSLIC's powers as a conservator or receiver. The Court held that this provision "prohibits courts from restraining or affecting FSLIC's exercise of those receivership 'powers and functions' that have been granted by other statutory sources." *Id.* at 574, 109 S.Ct. at 1369.

Because of the similarity of the two provisions, case law addressing section 1464(d)(6)(C) has been applied to cases involving section 1821(j). *Rosa v. RTC*, 938 F.2d 383, 399 n. 20 (3d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991). The statute empowering RTC to act as conservator or receiver states that RTC may, as conservator or receiver and subject to approval by the appropriate federal banking agency, "transfer any asset or liability of the institution in default ... without any approval, assignment, or consent with respect to

such transfer." 12 U.S.C. § 1821(d)(2)(G)(i)(II).

In this case, RTC transferred all the assets of MeraBank to MeraBank Federal. The judicial order sought by United Liberty would compel RTC to rescind that transaction. Such an order would limit RTC's exercise of power as a receiver for Mera-Bank and as a conservator for MeraBank Federal. We think the district court lacked the jurisdiction to issue such an order.

This conclusion accords with the very recent holding of the First Circuit in *Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703 (1st Cir.1992), a case involving the FDIC. In *Telematics*, the court considered plaintiff's action to enjoin FDIC from foreclosing on a certificate of deposit. The district court held that it lacked jurisdiction to enter an injunction against the FDIC in its capacity as receiver, and the First Circuit affirmed. The court noted that FIRREA created an elaborate administrative system by which FDIC may adjudicate claims against the insured institution. The court then held:

> In light of the elaborate structure created by FIRREA, and the evident intent of Congress that the structure should be permitted to stand with minimal court interference, we conclude that section 1821(j) deprived the district court of jurisdiction to enter the injunction that [plaintiff] sought in the present case.

*Id.* at 705. By analogy, the First Circuit's reasoning in that case is applicable here.

Because we hold that the district court lacked jurisdiction to consider United Liberty's claims for relief against the federal defendants, we shall not consider the substantive issues related to summary judgment, property interests, and contract rights.

### III.

#### A.

In Counts Two, Three, and Six of its complaint, United Liberty makes claims against the private defendants, alleging violations of civil RICO, bond fraud, and consumer fraud. The district court dismissed those claims, holding that it was without jurisdiction over the nonresident private defendants because they did not have the minimal contacts in Ohio required by the Ohio long-arm statute, Ohio Rev. Code Ann. § 2307.382 (Anderson 1991), and the Due Process Clause of the United States Constitution. *United Liberty*, 772 F.Supp. at 377–78. United Liberty argues that the basis for the court's personal jurisdiction over the private defendants is the Securities Exchange Act of 1934, §§ 10(b), 20, 27, and 29, 15 U.S.C. § 78j(b), 78t, 78aa, 78cc, and, with respect to the RICO claims, 18 U.S.C. §§ 1961–68. United Liberty argues that the district court had personal jurisdiction over the private defendants because section 27 of the Exchange Act authorizes nationwide service of process for cases brought under the Act.

The private defendants respond that this court may not consider United Liberty's Exchange Act argument since United Liberty did not make that claim in the district court.

Before the district court, the private defendants alleged that the district court did not have personal jurisdiction over them, relying on traditional minimum contacts arguments. In response, United Liberty argued only that the private defendants did have sufficient contacts with Ohio, the forum state. The district court agreed with the private defendants, and dismissed United Liberty's claims against them.

We note that United Liberty's complaint specifically alleged that the district court had jurisdiction under the Exchange Act, and the complaint cited section 27. Thus, although United Liberty did not present this section 27 argument in its response to the private defendants' motion for summary judgment and the district court, therefore, did not address the matter, the jurisdictional claim was before the district court.

Although ordinarily we do not review issues not raised in the district court, we shall, in this instance, since the matter is entirely a question of law and has been well briefed and argued by the parties. We exercise our authority over jurisdiction-

al questions and proceed to consider whether jurisdiction over the private defendants lies under section 27 of the Exchange Act.

### B.

 The private defendants advance two substantive responses: first, that jurisdiction under section 27 is predicated upon proper venue and venue is not proper in the Southern District of Ohio; and, second, that the nationwide service of process provisions of section 27 of the Exchange Act should be tempered by due process concerns.

Section 27 of the Exchange Act provides, in relevant part:

Any suit ... to enforce any liability or duty created by this chapter ... may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant....

15 U.S.C. § 78aa.

In *Haile v. Henderson Nat'l Bank*, 657 F.2d 816 (6th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1450, 71 L.Ed.2d 663 (1982), this court considered whether a district court possessed personal jurisdiction over a similar nationwide service of process statute, 28 U.S.C. § 1692. It held:

In an action where service of process is effected pursuant to a federal statute which provides for nationwide service of process, the strictures of *International Shoe* [*Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)] do not apply.

. . . .

The process authorized by § 1692 is not "extra-territorial" but rather nationwide.... As such, the minimum contacts analysis, as a limitation on state extra-territorial power, is simply inapposite.

*Id.* at 824, 826.

The Ninth Circuit, in *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir.1985), *rev'd on other grounds*, *Holmes v. Securities Investors*

*Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), specifically addressed section 27 of the Exchange Act:

Where a federal statute such as Section 27 of the Act confers nationwide service of process, "the question becomes whether the party has sufficient contacts with the United States, not any particular state."

(Citations omitted.)

We agree with United Liberty, and conclude that section 27 confers personal jurisdiction in any federal district court over any defendant with minimum contacts to the United States.

Nevertheless, whether section 27 provides refuge to United Liberty depends upon whether it has adequately stated a claim under section 27. That issue was not addressed below. Therefore, we shall remand the case for a determination as to whether United Liberty has made a sufficient allegation of personal jurisdiction under the Exchange Act.

As to the private defendants' venue arguments, we note that they were not considered by the district court. We shall therefore remand the issue to the district court for consideration.

### C.

 The private defendants argue, finally, that if this court holds that United Liberty has failed to state a claim against the federal defendants, then the claim against the private defendants necessarily fails. We disagree.

The three claims against the private defendants are not the same as the claims involving the federal defendants and are not derivative. The nature of the two sets of claims are distinctly different. The counts against the private defendants essentially allege fraud, rather than an unconstitutional taking or breach of contract. Moreover, since we have not addressed the substance of the claims against the federal defendants, but only the district court's jurisdiction to consider them, our decisions as to the federal defendants do not affect the claims against the private defendants.

### IV.

We hold that the district court lacked jurisdiction to consider United Liberty's claims for relief against the federal defendants. Therefore, we AFFIRM the court's grant of summary judgment as to defendants OTS, RTC, and FDIC.

We hold that the district court did not consider whether it possessed jurisdiction over the private defendants under section 27 of the Exchange Act. We therefore REVERSE the court's grant of the private defendants' motion to dismiss and REMAND the case for a determination of whether United Liberty has adequately pleaded a claim for relief under the Exchange Act, a claim that would permit the district court to exercise jurisdiction under section 27. If United Liberty has so pleaded, then the district court is instructed to consider whether the Southern District of Ohio is the proper venue for the suit.

CONTIE, Senior Circuit Judge, concurring.

I agree with the majority opinion except for Section II, B. In Section II, B, the majority states that the district court did not have jurisdiction because the enforcement of the stipulation agreement is committed to agency discretion and, therefore, falls within the exception to the APA's waiver of sovereign immunity, 5 U.S.C. § 701(a). I disagree.

Plaintiff, United Liberty Life, is arguing that OTS and FDIC must uphold the stipulation agreement because it constitutes an enforceable contract of which it is a third-party beneficiary. Section 401(g) of FIRREA states:

(1) EXISTING RIGHTS, DUTIES, AND OBLIGATIONS NOT AFFECTED.—

Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which—

(A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act); and

(B) existed on the day before the date of the enactment of this Act.

12 U.S.C. § 401(g). FIRREA thus provides that existing rights, duties and obligations between a bank and the FHLBB[1] are not affected by the passage of FIRREA and indicates that it is not within the discretion of OTS or FDIC to fail to uphold the prior obligations of the FHLBB. I believe the issue in the present case in regard to OTS and FDIC is (1) whether the stipulation agreement is a valid contract and (2) if so, whether it constitutes a prior obligation of the FHLBB which must be upheld by OTS. For this reason, I believe the district court had jurisdiction to determine whether the stipulation agreement constituted an enforceable contract.

I concur with the majority's dismissal of the claims against OTS and FDIC because I agree with the district court's determination on the merits that summary judgment should be granted to OTS and FDIC. The district court found, as a matter of law, that the stipulation agreement is not a contract, but the satisfaction of a condition set forth in the FHLBB's resolution approving the application of AZP (Pinnacle West's predecessor) to acquire MeraBank.[2] While United Liberty insists that the stipulation agreement constitutes a contract between

---

**1.** The Federal Home Loan Bank Board, which was the predecessor of OTS.

Pinnacle West applied to the FHLBB for permission to acquire Merabank. The agency granted Pinnacle West permission to acquire the savings and loan on December 6, 1986, subject to the condition that Pinnacle West stipulate that it would maintain the savings and loan's capital at the minimum level required by federal regulation. Pinnacle West complied with the stipulation and acquired MeraBank.

**2.** The Resolution mandates "[t]hat AZP shall stipulate to the corporation that as long as it controls MeraBank, AZP will cause the net worth of MeraBank to be maintained at a level consistent with that required by Section 563.13 of the Insurance Regulations ... and, as necessary, will infuse sufficient additional equity capital...."

Pinnacle West and OTS, plaintiff cites no authority to support this view. Several courts have examined the issue of whether a capital maintenance commitment given by a holding company of a savings and loan constitutes a valid contract. In *In re Conner Corporation*, 1990 WL 124052 (Bankr. E.D.N.Y. July 9, 1990), a failed savings and loan association brought suit against its holding company alleging that the holding company breached a contract with FHLBB to maintain the net worth of the savings and loan at a specified level. The bankruptcy court noted that the FHLBB resolution approving the savings and loan association's application for deposit insurance contained a condition subsequent requiring a capital maintenance commitment from the holding company of the savings and loan. The *Conner* court stated what is axiomatic in the law of contracts: that a contract is the result of an offer and an acceptance resulting in a meeting of the minds of the parties supported by a mutual exchange of appropriate consideration. The *Conner* court held that the capital maintenance commitment given by the holding company failed to satisfy these requirements and, therefore, did not create an agreement between the parties:

> The series of resolutions and the conduct of the parties does not give rise to a contract between Conner [the holding company] and FHLBB.... The intention of FHLBB was to require Conner to submit to the jurisdiction and regulatory powers of FHLBB. Likewise, Conner's resolution to file the necessary application and to maintain Cardinal's net worth was never intended by Conner to be an "offer" or "acceptance" so as to give rise to a contract between the parties.

*Id.* at 8–9. The *Conner* Court further found that even if the parties intended to create a contract, no contract was formed because of a lack of consideration:

> There was no consideration from FHLBB to Conner or Cardinal to support Conner's "agreement" to maintain Cardinal's net worth. Such "agreement" was merely a part of the process of applying for federal insurance on the deposits in the subsidiary. FHLBB was doing what it was required to do under the law and its regulations. Likewise, Conner was simply complying with the regulatory requirements of FHLBB.... A promise to perform an act which promisor is already bound to perform is insufficient consideration for a promise by the other party.

*Id.* (citations omitted).

In *Resolution Trust Corp. v. Tetco, Inc.*, 758 F.Supp. 1159 (W.D.Tex.1990), the district court held that a holding company's stipulation to maintain the net worth of a savings and loan association did not constitute a valid contract. The *Tetco* court found that no meeting of the minds occurred with respect to the essential nature of the transaction and ruled that the net worth condition in the FHLBB resolution was not a contract, but a statement setting forth a regulatory condition with which the holding company complied in its subsequent stipulation. Its commitment to abide by the regulation was not "bargained for" consideration that would support a contract. *Id.* at 1162.

I believe the reasoning of these cases applies in the present case. AZP, predecessor in interest to Pinnacle West, sought to acquire MeraBank and, to that end, undertook to comply with the federal regulations governing the acquisition. The FHLBB approved the acquisition subject to AZP's fulfillment of certain conditions contained in the FHLBB resolution. One condition was the execution of a stipulation by AZP to maintain the capital level of MeraBank in accordance with applicable federal regulations and to infuse MeraBank with capital as necessary to achieve such compliance. The obvious intention of AZP was to acquire control of MeraBank; the FHLBB intended to ensure that the acquisition was governed by the appropriate federal regulations. In complying with the regulatory agency's conditions, AZP did not make an offer nor did it accept an offer from FHLBB. There was not a meeting of the minds between the parties as contemplated by the principles of contract formation. The capital maintenance condition contained in the FHLBB resolution was a legal requirement AZP undertook to perform—

the stipulation thus had no underlying consideration. Furthermore, the stipulation stated that it was provided solely for the benefit of the federal regulators and could not be enforced by any other party. For these reasons, I believe the district court correctly found that the stipulation agreement does not constitute a contract and, accordingly, plaintiff may not maintain a breach of contract claim premised upon it. I thus concur in the majority's conclusion that the claims against OTS and FDIC should be dismissed. I believe, however, that the district court had jurisdiction to hear the claims and properly dismissed them on the merits.