# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 25, 2025

Lyle W. Cayce
Clerk

No. 22-11172

Cornelius Campbell Burgess,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

Jennifer Whang, *In her official capacity as an Administrative Law Judge*;
Federal Deposit Insurance Corporation; Martin J.
Gruenberg, *In his official capacity as Acting Chairman of the FDIC*;
Michael J. Hsu, *In his official capacity as a Director of the FDIC*;
Rohit Chopra, *In his official capacity as a Director of the FDIC*,

*Defendants—Appellants/Cross-Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 7:22-CV-100

_____

Before Wiener, Douglas, and Ramirez, *Circuit Judges*.
Jacques L. Wiener, Jr., *Circuit Judge*:

The Federal Deposit Insurance Corporation (FDIC) initiated an enforcement action against Cornelius Burgess, the former CEO of Herring Bank. After the Administrative Law Judge (ALJ) issued her recommended decision to the FDIC Board of Directors (the Board), but before the Board issued its final decision, Burgess filed suit in federal district court seeking to enjoin the issuance of that final decision on various constitutional bases. The

No. 22-11172

district court granted Burgess's requested injunctive relief in full on one basis but not the others. Because 12 U.S.C. § 1818(i)(1) explicitly strips district courts of subject matter jurisdiction to issue injunctive relief in this circumstance, we remand with instructions to dismiss.

I.

When the FDIC opens an enforcement action against a party, that proceeding begins with assignment of the case to an ALJ who conducts hearings or other proceedings consistent with the Administrative Procedure Act (APA) and the FDIC's own Rules of Practice and Procedure. *See* 5 U.S.C. §§ 551–559, 701-706, 1305, 3105, 3344, 5372, 7521; 12 C.F.R. Part 308. The ALJ then issues a recommendation, to which parties may file exceptions or other post-proceeding briefings. 12 C.F.R. §§ 308.38–39. Those materials are sent to the Board for review and issuance of a final order, sometimes also referred to as a final decision. *Id.* § 308.40. Within thirty days of the Board's issuance of its final order, a party may appeal to the United States Court of Appeals for the District of Columbia Circuit or the circuit where the bank's home office is located. 12 U.S.C. § 1818(h)(2).

The FDIC began its investigation into Burgess in 2010 and initiated an enforcement action in 2014. In early 2017, the ALJ issued a recommendation to the Board that Burgess be removed from his bank-related positions, prohibited from working in the banking industry (known as a "prohibition order"), and assessed a $200,000 civil penalty. The Board accepted that recommendation and issued its final order later that year. Burgess then sought review of that final order from this court, as he is permitted to do under 12 U.S.C. § 1818(h)(2) and, in urging us to stay that final order pending appeal, maintained that the ALJ was unconstitutionally appointed.

No. 22-11172

In September 2017, we stayed that FDIC order pending the Supreme Court's disposition of *Lucia v. SEC*, 585 U.S. 237 (2018), a case concerning the constitutionality of ALJ appointments. *Burgess v. FDIC*, 871 F.3d 297, 302 (5th Cir. 2017) (staying the order because Burgess was likely to succeed on his Appointments Clause challenge). The *Lucia* Court ultimately held that ALJs within the Securities and Exchange Commission (SEC) are officers that must be appointed by the President, a court of law, or a department head. 585 U.S. at 244–45. After *Lucia*, we remanded Burgess's case back to the FDIC for adjudication before a constitutionally appointed ALJ.

The process began anew in front of ALJ Jennifer Whang in late 2019. After several pandemic-related postponements, ALJ Whang conducted her own proceedings, including a three-day supplemental hearing in 2022, and ultimately recommended the same recourse: that Burgess be removed from his CEO position, prohibited from working in the banking industry, and assessed a $200,000 fine. Burgess filed his exceptions, and those materials were sent to the Board for consideration and issuance of a final order. However, before the Board could act, Burgess filed suit in federal district court to enjoin the issuance of a final order.

In district court, Burgess pleaded three counts of declaratory relief, asserting that: (1) the Board is unconstitutionally shielded from removal; (2) the FDIC's ALJs are unconstitutionally shielded from removal; and (3) the FDIC unconstitutionally deprived him of his Seventh Amendment right to a trial by jury. He sought an "injunction barring continuation of the Enforcement Proceeding" on those grounds.

The district court first assured itself that it had jurisdiction to hear the suit at all, given 12 U.S.C. § 1818(i)'s seemingly explicit divestment of district court jurisdiction over this type of suit. to *Burgess v. FDIC*, 639 F. Supp. 3d 732, 740–45 (N.D. Tex. 2022. The court characterized

3

jurisdictional preclusion under § 1818(i)(1) as a question of first impression, rejected the applicability of our recent opinions discussing that issue, and ultimately concluded that the statute neither explicitly nor implicitly strip it of jurisdiction to hear the suit. *Id.*

On the merits, the district court noted that Burgess's removal claims "have merit," but it denied an injunction on those grounds because Burgess was required to "demonstrate not only that the removal restriction violates the Constitution, but also that 'the unconstitutional removal provision inflicted harm.'" *Id.* at 746 (quoting *Collins v. Yellen*, 594 U.S. 220, 260 (2021)). Because Burgess "provided no evidence" of that kind of harm, he did not show that he was likely to succeed on the merits of these claims and therefore could not satisfy the requirements for injunctive relief. *Id.* at 746–47.

The district court did find, however, that Burgess was likely to succeed on the merits of his Seventh Amendment claim. *Id.* at 747–49. It then considered the other injunction factors and found that they too supported Burgess on this matter, so it enjoined the FDIC's enforcement proceeding in full. *Id.* at 749–50.The FDIC appealed the grant of the injunction, and Burgess cross-appealed the denial of the injunction on his removal counts. On appeal, the FDIC asserts that the governing statute, 12 U.S.C. § 1818(i)(1), contains an explicit jurisdictional preclusion provision, and that the district court erred by concluding it had subject matter jurisdiction to issue injunctive relief. Because we agree, we do not reach the merits of Burgess's constitutional allegations or his cross-appeal.

No. 22-11172

## II.

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), as this appeal arises from the interlocutory decision granting a preliminary injunction. *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 395 (5th Cir. 2025).

## III.

We begin with an overview of § 1818 before turning to our relevant precedent that discusses its jurisdictional preclusion language. We then address Burgess's contention that the Supreme Court requires more from Congress to preclude constitutional claims, and we conclude by harmonizing some cases that discuss our relevant precedent.

## A.

The governing statute in this case is 12 U.S.C. § 1818. It provides the framework under which federal regulators[1] enforce certain banking laws, and it sets forth various paths the regulator can take to ensure a bank's[2] compliance and rectify a bank's non-compliance with various federal requirements. For example, the FDIC can terminate a bank's insured status, § 1818(a)(2), (a)(8), issue a cease-and-desist order if a bank is engaging in unsafe or unsound banking practices or violating the law, *id.* § 1818(b)–(c), remove an individual from his or her role at a bank and/or prohibit his or her

---

[1] The statute uses the term "appropriate Federal banking agency," which is defined in 12 U.S.C. § 1813(q) according to the type of banking institution at issue. For example, the FDIC is the "appropriate Federal banking agency" with respect to "State nonmember insured bank[s]," like Herring Bank in this matter, as well as "foreign bank[s] having an insured branch" and "State savings association[s]." *See id.* § 1813(q)(2).

[2] The statute uses the term "insured depository institution," which is defined as "any bank or savings association the deposits of which are insured by the [FDIC] pursuant to this chapter." *Id.* § 1813(c)(2). *See generally id.* § 1818 (using the term throughout). For simplicity and clarity, we use the term "bank" when discussing such institutions.

future participation in the banking industry, *id.* § 1818(e), and levy civil monetary penalties against a bank or bank-affiliated individual, *id.* § 1818(i)(2). As mentioned earlier, any proceeding conducted under this statute must be "conducted in accordance with the provisions of [the APA]," and, within ninety days of the case's submission to the Board, the Board "shall render its decision." *Id.* § 1818(h)(1). A party may obtain judicial review of a final order by filing in the appropriate circuit court of appeals. *Id.* § 1818(h)(2).

The statute enumerates specific circumstances in which either the regulatory agency or a party to an action may proceed in federal district court, either instead of or parallel to the agency's in-house action. For example, if the FDIC issues an order temporarily suspending a bank's insurance, within ten days of being served with such order, that bank may apply to the District Court for the District of Columbia or the district court for the judicial district in which the bank's home office is located "for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order, and such court shall have jurisdiction to issue such injunction." *Id.* § 1818(a)(8)(D). Similarly, if the FDIC issues a temporary cease-and-desist order, within ten days of being served with such order, that bank may apply to a district court "for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order pending the completion of the administrative proceedings pursuant to the notice of charges served upon [it] . . . and such court shall have jurisdiction to issue such injunction." *Id.* § 1818(c)(2). A party who has been suspended from office or prohibited from working for a bank may, within ten days following such order, apply to federal district court "for a stay of such suspension and/or prohibition pending the completion of the administrative proceedings . . . and such court shall have jurisdiction to stay such suspension and/or prohibition." *Id.* § 1818(f).

No. 22-11172

On the agency side, "[i]n the case of violation or threatened violation of, or failure to obey, a temporary cease-and-desist order," the agency "may apply to" a federal district court "for an injunction to enforce such order, and, if the court shall determine that there has been such violation or threatened violation or failure to obey, it shall be the duty of the court to issue such injunction." *Id.* § 1818(d). If a bank or bank-affiliated party "fails to pay an assessment after any penalty assessed under [§ 1818(i)(2)] has become final, the agency that imposed the penalty shall recover the amount assessed by action in the appropriate United States district court." *Id.* § 1818(i)(2)(I)(i). Then, either the agency or a party to a proceeding may apply to a federal district court to enforce a subpoena related to the enforcement action, "and such court[] shall have jurisdiction and power to order and require compliance therewith." *Id.* § 1818(n).

Finally, pertinent to this case, § 1818(i)(1) states the following in full:

The appropriate Federal banking agency may in its discretion apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for the enforcement of any effective and outstanding notice or order issued under this section or under section 1831o or 1831p-1 of this title, and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section or under section 1831o or 1831p-1 of this title *no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section*, or to review, modify, suspend, terminate, or set aside any such notice or order.

*Id.* § 1818(i)(1) (emphasis added).

The question before us is whether the emphasized language above precludes district court jurisdiction in this matter. We conclude that it does.

No. 22-11172

B.

To begin, "Congress can limit district court jurisdiction if it so chooses." *Cochran v. SEC*, 20 F.4th 194, 200 (5th Cir. 2021) (en banc), *aff'd sub nom.*, *Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023). Both this circuit and the Supreme Court have recognized that Congress may limit jurisdiction, either explicitly or implicitly, and these approaches require different analyses. *See Bank of La. v. FDIC*, 919 F.3d 916, 923 (5th Cir. 2019); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (recognizing that jurisdiction may be precluded explicitly or implicitly); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–13 (1994) (providing the implicit preclusion framework, known as the *Thunder Basin* factors). *But see Axon*, 598 U.S. at 208 (Gorsuch, J., concurring) (expressing skepticism about the wisdom of implicit preclusion jurisprudence and pointing to § 1818(i)'s straightforward language as an ideal example of explicit congressional intent to preclude jurisdiction).

"To discern an explicit preclusion, [courts] examine whether 'the text . . . expressly limit[s] the jurisdiction that other statutes confer on district courts,' such as 28 U.S.C. § 1331." *Bank of La.*, 919 F.3d at 923 (second and third alterations in original) (quoting *Free Enter. Fund*, 561 U.S. at 489); *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 25 (2012) (Alito, J., dissenting) (stating that "[w]hen dealing with an express preclusion clause . . . , we determine the scope of preclusion simply by interpreting the words Congress has chosen"). For example, in *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000) the Supreme Court interpreted a Medicare regulation to explicitly preclude district court jurisdiction when it read: "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 . . . of title 28 to recover on any claim arising under this subchapter." *Id.* at 9 (citation modified) (emphasis omitted).

8

No. 22-11172

Discerning implicit preclusion is more involved, and courts apply a two-step analysis. First, courts consider whether "the statutory scheme displays a fairly discernible intent to limit jurisdiction." *Free Enter. Fund*, 561 U.S. at 489 (citation modified). Courts look to the "text, structure, and purpose" of the statutory scheme to answer this question. *Elgin*, 567 U.S. at 10. Second, courts ask whether "the claims at issue are of the type Congress intended to be reviewed within the statutory structure." *Free Enter. Fund*, 561 U.S. at 489 (citation modified). In analyzing this second inquiry, courts examine three factors: (1) whether "preclusion could foreclose all meaningful judicial review"; (2) whether the suit is "wholly collateral to a statute's review provisions"; and (3) whether the claims are "outside the agency's expertise." *Thunder Basin Coal Co.*, 510 U.S. at 212–13 (citation modified). Each of these *Thunder Basin* factors have their own judicial gloss and tests.[3]

_____

[3] The Supreme Court has held that there is no meaningful judicial review of a Board's action when the statutory scheme allowed review of a final *Commission* order but when not all *Board* actions culminate in such. *Free Enter. Fund*, 561 U.S. at 489. A plaintiff in such a scenario "would have had to 'bet the farm' to obtain judicial review" because they would have to "voluntarily incur a sanction at the board level to raise its constitutional claim in the circuit court, risking severe punishment should its challenge fail." *Bank of La.*, 919 F.3d at 926 (citation modified) (emphasis omitted) (quoting *Free Enter. Fund*, 561 U.S. at 490). Betting the farm is not meaningful review. *See id.* In general, however, "[t]he Supreme Court has held that Congress provides meaningful judicial review by authorizing review of challenges to a final agency order by a federal circuit court." *See id.* at 925 (collecting cases).

Whether a claim is "wholly collateral" depends on whether it is "inextricably intertwined with the conduct of the very enforcement proceeding" and whether the claims "arise outside the [agency's] administrative enforcement scheme." *Id.* at 928 (citation modified).

A claim is within the expertise of the agency when it depends on a special understanding of the industry itself, but is outside the agency's expertise when it "presents only 'standard questions of administrative law, which the courts are at no disadvantage in answering.'" *Cochran*, 20 F.4th at 207–08 (quoting *Free Enter. Fund*, 561 U.S. at 491).

No. 22-11172

This circuit's precedent on jurisdictional preclusion requires contextualization. The two cases that are on-point are the en banc *Cochran* decision, affirmed by the Supreme Court in *Axon*, and *Bank of Louisiana*. In *Cochran* we interpreted a provision of the Securities Exchange Act of 1934 (§ 78y); in *Bank of Louisiana* we interpreted § 1818(i), making its holding and analysis especially relevant to this case. *Cochran*, 20 F.4th at 202; *Bank of La.*, 919 F.3d at 923. To explain how these cases intersect, we begin by discussing *Bank of Louisiana* before moving to *Cochran* and its "clarif[ication]" of the *Bank of Louisiana* holding.

The facts of *Bank of Louisiana* are starkly similar to the facts here. The FDIC began investigating a New Orleans-based bank and its officers for violations of various banking regulations and officer misconduct, like approving illegal loans. 919 F.3d at 920–21. Around the same time, the FDIC initiated two different enforcement actions against the bank and at least one reached our court for review of a final agency decision pursuant to § 1818(h)(2). *See Scott v. FDIC*, 684 F. App'x 391, 397 (5th Cir. 2017) (per curiam). While the second action was pending before the Board, the bank filed suit in district court "claiming the FDIC committed constitutional violations during the enforcement proceedings." *Bank of La.*, 919 F.3d at 921. The bank sought an injunction to prevent the Board from issuing its final order in the second enforcement action still pending before it, as well as declaratory relief on its equal protection and due process constitutional claims, though it ultimately abandoned its injunctive request (leaving only declaratory relief). *Id.* at 921–22. The FDIC moved to dismiss for lack of subject matter jurisdiction, citing § 1818(i), and the district court granted that motion. *Id.* We affirmed. *Id.* at 930.

In that unanimous opinion, we explained that "[t]he parties and the district court addressed the question presented under the implicit preclusion analysis" and therefore we did the same. *Id.* at 923. We then conducted the

10

two-step inquiry, beginning with "whether it is 'fairly discernible' from the 'text, structure, and purpose of 12 U.S.C. § 1818 that Congress intended to preclude district court jurisdiction.'" *Id.* (quoting *Elgin*, 567 U.S. at 10). Although the bank conceded that the plain language of § 1818 satisfies this first step, we took some time to explain why that is correct. We characterized "the section 1818 scheme as a 'comprehensive system for judicial review' of agency orders and a 'detailed framework . . . for orderly review of the various stages of enforcement.'" *Id.* at 924 (alteration in original) (first quoting *Rhoades v. Casey*, 196 F.3d 592, 597 (5th Cir. 1999), then quoting *Bd. of Governors of Fed. Rsrv. Sys. v. DLG Fin. Corp.*, 29 F.3d 993, 999 (5th Cir. 1994)). Moreover, we observed that "[d]istrict court jurisdiction is prescribed only in specific circumstances" under this comprehensive statutory scheme. *Id.* (citing § 1818(a)(8)(D), (c)(2), (d), (f), (i)(1), (i)(2)(I)(i), (n)). "This calibrated structure is, for present purposes, materially the same as review structures the Supreme Court and sister circuits have found expressive of Congress' intent to preclude district court jurisdiction." *Id.* (collecting cases).

We noted that the FDIC had urged the court to stop at this point because "so robust is the section 1818(i)(1) bar" that analyzing the *Thunder Basin* factors would be unnecessary. *Id.* However "tempting," "sensibl[e]," and "attractive[]" that offer was, we nevertheless thought it "prudent to cycle through the *Thunder Basin* factors, as did the district court," ultimately holding that those factors "reinforce the conclusion that the review scheme precludes district court jurisdiction over the [b]ank's claims."[4] *Id.* at 924–25.

---

[4] On factor 1, we reasoned that "there can be meaningful review in the circuit court even if the agency itself lacks authority to decide the constitutional question presented" and specifically noted that the bank had brought not only equal protection and due process claims, but also a separation-of-powers claim targeting the appointment of ALJs. *Bank of La.*, 919 F.3d at 926 (citing *Elgin*, 567 U.S. at 17); *see also In re Bank of La.*, FDIC-12-489b,

Importantly, the claims at issue included run-of-the-mill constitutional claims, like due process and equal protection claims, as well as a structural constitutional claim—the bank had challenged the legitimacy of the ALJ's appointment. *See In re Bank of La.*, FDIC-12-489b, FDIC-12-479k, 2016 WL 9050999, at *13 (F.D.I.C. Nov. 15, 2016) (FDIC enforcement decision, addressing the bank's separation-of-powers claim).

Sitting en banc in *Cochran*, we grappled with the Exchange Act, not § 1818, and the provision we analyzed differed in relevant ways from § 1818(i). *See* 20 F.4th at 204. But in *Cochran*, we had reason to discuss *Bank of Louisiana* because the SEC relied on it to argue that jurisdiction was precluded. *Id.* In rejecting that argument, we distinguished *Bank of Louisiana*:

> Critically, the statutory-review scheme at issue in that case differed in a key respect from the Exchange Act's: in *Bank of Louisiana*, the scheme included an explicit statutory bar on any court enjoining "the issuance or enforcement of any . . . [FDIC] order." Accordingly, we held that district court jurisdiction was *explicitly* divested. Although we proceeded to analyze the *Thunder Basin* factors, we did so merely to "reinforce" our conclusion based on the explicit jurisdictional bar. Consequently, we clarify that *Bank of*

------

FDIC-12-479k, 2016 WL 9050999, at *13 (F.D.I.C. Nov. 15, 2016) (FDIC enforcement decision addressing separation-of-powers and Appointments Clause claim). On factor 2, we reasoned that the claims were not "wholly collateral" because they were "inextricably intertwined with the conduct of the very enforcement proceeding the statute grants the [FDIC] the power to institute and resolve as an initial matter." *Bank of La.*, 919 F.3d at 928 (alteration in original) (quoting *Jarkesy v. SEC*, 803 F.3d 9, 23 (5th Cir. 2015)). On factor 3, we concluded that "the FDIC could have mooted the [b]ank's constitutional claims by finding the [b]ank innocent" and thereby avoided the constitutional questions entirely, or "the agency's banking expertise could have shed light on the [b]ank's constitutional claims." *Id.* at 929–30; *see also id.* at 930 ("To be sure, the [b]ank's separation-of-powers challenge to the ALJ does not directly implicate the agency's expertise in the way the [b]ank's other constitutional claims do. But this is not dispositive under *Elgin*.").

No. 22-11172

> *Louisiana* was addressing the explicit statute at issue there—
> not all statutes that may be questioned—and it does not
> mandate the outcome here.

*Id.* (emphases and alterations in original) (citations omitted).

Burgess contends that this fails to reflect what actually occurred. He points out that in *Bank of Louisiana* we were "tempt[ed]" to end with an explicit-preclusion analysis based on the plain language of § 1818(i), but that we nevertheless cycled through an implicit-preclusion analysis. *See Bank of La.*, 919 F.3d at 924–25. First, we disagree with Burgess's position because it is unsupported by the language of that case. We cycled through the *Thunder Basin* factors because we found it "prudent" to do so, given that the district court below had done so. *Id.* at 925. But that analysis "*reinforce[d]* the conclusion that the review scheme precludes district court jurisdiction." *Id.* (emphasis added). If we were concluding that the statute did not explicitly preclude jurisdiction, but did so implicitly, there would be nothing to reinforce. This was our reasoning in *Cochran* when we "clarif[ied] that *Bank of Louisiana* was addressing the explicit statute at issue." 20 F.4th at 204.

Second, even if we were to agree with Burgess's reading of *Bank of Louisiana*, we are bound to apply *Cochran*. When an en banc court clarifies one of its earlier precedents, the clarification is what controls.[5] *See, e.g.*, *United States v. Brigham*, 382 F.3d 500, 503, 509–11 (5th Cir. 2004) (en banc)

---

[5] Burgess contends that this clarified holding was not central to *Cochran*'s holding and is thus nonbinding dicta. We disagree—the SEC advanced two arguments in support of its position in *Cochran*: (1) that other circuits are in unison on the SEC's preferred reading of *Free Enterprise Fund*; and (2) even if its *Free Enterprise Fund* argument fails, our holding in *Bank of Louisiana* mandates an outcome in the SEC's favor. *Cochran*, 20 F.4th at 203–05. We rejected both, making this clarification necessary to our ultimate result. *Id.*; *see also United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014) ("A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law." (quoting *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004))).

13

No. 22-11172

("[c]larifying prior precedents" on Fourth Amendment traffic stop cases and then applying the clarified approach); *see also United States v. Murphy*, 578 F.3d 719, 721 (8th Cir. 2009) (applying an en banc's clarification of precedent as controlling law); *Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 174 F.3d 1115, 1117–18 (10th Cir. 1999) (same).

Bolstering our holding, we find support from the Supreme Court. In *Board of Governors of Federal Reserve System v. MCorp Financial Inc.*, 502 U.S. 32 (1991), the Supreme Court emphasized "the clarity of the congressional preclusion of review in [§ 1818(i)(1)]," explaining that "Congress has spoken clearly and directly: '*[N]o court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [Board] notice or order under this section.*'" *Id.* at 44 (1991) (emphasis and alterations in original) (quoting 12 U.S.C. § 1818(i)(1) (1988 ed., Supp. II)).[6] And in *Axon*, the case affirming our en banc decision in *Cochran*, Justice Gorsuch's concurrence favorably points to § 1818(i)(1) as an example of clear congressional intent to provide for explicit preclusion of district court jurisdiction. *Axon*, 598 U.S. at 208 (Gorsuch, J., concurring) (explaining that when Congress wants to strip jurisdiction from district courts, "it does not ask us to juggle a variety of

---

[6] *MCorp* involved a bankruptcy proceeding wherein a debtor moved to enjoin the Fed's Board of Governors from proceeding in its administrative action against it. 502 U.S. at 34. The debtor urged injunctive relief pausing these actions because of the bankruptcy stay, making *MCorp* less factually analogous to Burgess's case, but importantly the Supreme Court grappled with § 1818(i)'s jurisdictional preclusion language. *Id.* at 36–37. "The action before us is not a challenge to a temporary Board order, nor a petition for review of a final Board order, nor an enforcement action initiated by the Board. Instead, [§ 1818's] preclusion provision appears to speak directly to the jurisdictional question at issue in this litigation:" whether a district court may enjoin the enforcement action from proceeding *at all*. *Id.* at 38–39. The Supreme Court held that the court of appeals erred by relying on a distinguishable case involving the NLRB, and that "Congress has spoken clearly and directly" in § 1818(i)(1) to preclude a district court's jurisdiction to affect by injunction (or otherwise, like declaratory relief) an ongoing enforcement proceeding. *Id.* at 44.

factors and then guess at the implicit intentions of legislators past. It simply tells us," and citing 12 U.S.C. § 1818(i)(1) by way of example).

Given this backdrop, it is no surprise that other courts recently interpreting § 1818(i)(1) have concluded that it explicitly precludes jurisdiction. *See, e.g.*, *Bonan v. FDIC*, No. 4:23CV8, 2023 WL 156852, at *4 (E.D. Mo. Jan 11, 2023) (holding that § 1818(i) explicitly strips district courts of jurisdiction, including over constitutional claims, and that plaintiffs "who wish to raise constitutional challenges must raise them with the Court of Appeals" as provided in § 1818(h)); *Ponte v. FDIC*, No. 1:23-cv-00165, 2023 WL 6441976, at *2 (D.R.I. Oct. 3, 2023) (holding that "§ 1818(i)(1) precludes this Court's jurisdiction over Mr. Ponte's claims, constitutional or otherwise" and that "those claims must be raised in the administrative process and . . . may be reviewed by the appropriate court of appeals"); *Ponte v. FDIC*, No. 24-cv-2379, 2024 WL 4730602, at *8 (D.D.C. Oct. 11, 2024) (same party as the prior-cited case but separate appeal and separate attempt to enjoin the FDIC, yet with the same outcome: dismissing the suit pursuant to § 1818(i)).

We join this chorus in our holding today.

## C.

Notwithstanding the clarity of language contained in § 1818(i)(1), Burgess contends that *Webster v. Doe*, 486 U.S. 592 (1988), mandates an even-more-explicit preclusion of constitutional claims. Even though § 1818(i)(1) states that "[no] court shall have jurisdiction" to issue the injunction he sought—enjoining "the issuance or enforcement of any notice or order"—Burgess maintains that we should read in an exception for constitutional claims because the Supreme Court stated that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Id.* at 603 (citing *Johnson v. Robinson*, 415 U.S.

361, 373–74 (1974)). But since *Webster*, the Supreme Court and our circuit have both clarified the meaning of that language, and it does not save Burgess here.

In *Webster*, the respondent was an employee at the Central Intelligence Agency (CIA) who had been evaluated as "excellent" and "outstanding" in his job performances. *Id.* at 594–95. After working for the agency for nearly a decade, he voluntarily disclosed that he was gay, and the CIA immediately placed him on administrative leave before ultimately revoking his clearance and dismissing him pursuant to § 102(c) of the National Security Act. *Id.* at 595. The CIA Director reasoned that the "respondent's homosexuality posed a threat to security, but declined to explain the nature of the danger." *Id.* The respondent sued in federal district court, alleging that the Director's actions violated the APA, his Fifth Amendment due process and equal protection rights, and his constitutionally protected rights to property, liberty, and privacy. *Id.* at 596. The issue before the Supreme Court was "whether, and to what extent, the termination decisions of the Director under § 102(c) [of the National Security Act] are judicially reviewable." *Id.* at 594.

Much of the Court's analysis focused on the APA provision in § 701(a)(2), which precludes APA applicability when "agency action is committed to agency discretion by law."[7] *See id.* at 597–602 (quoting 5 U.S.C. § 701(a)(2)). The Court then turned to the constitutional claims.

---

[7] The Court observed that whether agency action is committed to discretion by law "requires careful examination of the statute on which the claim of agency illegality is based"—in that case, § 102(c). *Webster*, 486 U.S. at 600. After parsing the statutory language and "the overall structure of the [National Security Act]," the Court held that "Congress meant to commit individual employee discharges to the Director's discretion, and that § 701(a)(2) accordingly precludes judicial review of these decisions under the APA." *Id.* at 600–01.

First, it acknowledged "confusion . . . as to the precise nature of respondent's constitutional claims," attributing the confusion in part to the inconsistent reasons the CIA gave the respondent when it fired him. *Id.* at 602. The Court then rejected the CIA's broad assertion that all CIA termination decisions are discretionary and thus unreviewable, "even those based on policies normally repugnant to the Constitution." *Id.* at 603.

> In rejecting that position, the Court explained:

> We emphasized in *Johnson v. Robison* that where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear. In *Weinberger v. Salfi,* we reaffirmed that view. We require this heightened showing in part to avoid the "serious constitutional question" that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.

*Id.* (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986)) (first citing *Johnson*, 415 U.S. at 361; and then citing *Weinberger v. Salfi*, 422 U.S. 749 (1975)).

Twenty years later, the Supreme Court clarified that language in *Elgin*. 567 U.S. at 8–10. The *Elgin* petitioners relied on *Webster* to argue that "the general grant of federal-question jurisdiction in 28 U.S.C. § 1331, which gives district courts authority over constitutional claims, remains undisturbed unless Congress explicitly directs otherwise." *Id.* at 8–9. The Court disagreed. "Petitioners' argument overlooks a necessary predicate to the application of *Webster*'s heightened standard: a statute that purports to 'deny *any* judicial forum for a colorable constitutional claim.'" *Id.* at 9 (emphasis added) (quoting *Webster*, 486 U.S. at 603). In other words, "*Webster*'s standard does not apply where Congress simply channels judicial review of a constitutional claim to a particular court," like the courts of

appeals.[8] *Id.* As such, the Court concluded that the statute at issue in *Elgin* "does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit." *Id.* at 10. The same holds true for § 1818(i)(1).

Just recently, in *Zummer v. Sallet*, 37 F.4th 996, 1008-12 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 1019 (2023) (mem.), we declined to extend *Webster*'s holding because we found it did not apply, even though Zummer could not seek meaningful review in the courts of appeals for his constitutional claims. Like *Webster*, *Zummer* involved a security clearance issue, but FBI Agent Zummer did not pursue his claim administratively because the Merit Systems Protection Board (MSPB) "lacks authority to 'examine the merits of . . . security-clearance denial[s].'" *Id.* at 1005 (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 526 (1988)). Zummer "didn't appeal to the MSPB because it had no means of providing him relief," so instead he sought judicial review in federal district court. *Id.* at 1004–05. But we emphasized that "[t]he Supreme Court has twice rejected federal employees' attempts to sidestep the [Civil Service Reform Act's (CSRA)] remedial scheme" by suing in federal court, including in *Elgin*. *Id.* at 1005. Even though we concluded that "[t]he CSRA doesn't provide for 'meaningful review' of some of Zummer's claims"—namely, his

---

[8] The Court explained that this was also its holding in *Thunder Basin*. *Elgin*, 567 U.S. at 9 (citing *Thunder Basin*, 510 U.S. at 200). The *Elgin* Court emphasized that the *Thunder Basin* "plaintiff's claims could be meaningfully addressed in the Court of Appeals and that the case therefore did not present the serious constitutional question that would arise if an agency statute were construed to preclude all judicial review of a constitutional claim." *Id.* (citation modified).

constitutional claims—we still held that the Act precludes district court jurisdiction.[9] *Id.* at 1007–08 (quoting *Elgin*, 567 U.S. at 16).

Zummer's "final riposte" was an appeal to *Webster*, urging us to "demand a clearer statement from the CSRA" divesting district courts of jurisdiction over constitutional claims. *Id.* at 1008. But not only did *Webster* "not require us to import its clear-statement rule," there are also countervailing reasons *not* to extend *Webster*. *Id.* at 1008–12. The clear-statement rule is a creature of the constitutional avoidance canon of construction, but "[t]here's no need for avoidance 'where a constitutional question, while lacking an obvious answer, does not lead [a court] gravely to doubt that [a] statute is constitutional.'" *Id.* at 1009 (alterations in original) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 239 (1998)). We did not gravely doubt the constitutionality of the CSRA, so we saw no need to apply *Webster*. *Id.* at 1010–11. Further, we had "countervailing doubts" about the constitutionality of Zummer's position—that federal courts can wade into security-clearance decisions—because the Constitution textually commits that power to the President. *Id.* at 1011–12.

Much of *Zummer*'s analysis is unique to the security-clearance and intelligence realm, and thus distinguishable from Burgess's banking enforcement context. But in *Zummer*, we affirmed our understanding from *Elgin* that the availability of judicial review in the courts of appeals is enough to avoid *Webster*'s clear-statement rule and preclude a constitutional claim from entitlement to suit in the district courts. *See id.* at 1006–07. And even though "[m]eaningful review of [Zummer's] constitutional claims [wa]s entirely foreclosed," unlike in *Elgin*, we *still* did not import *Webster*. *Id.* at

---

[9] "Here, the lack of meaningful review is not enough to overcome the strength of the inference produced by the other two *Thunder Basin* factors and the well-settled, binding implications of the CSRA's text and structure." *Zummer*, 37 F.4th at 1008.

1009. If we did not see fit to do so in *Zummer*, *a fortiori*, we do not see fit to do so today for Burgess, who can seek meaningful review of his constitutional claims in the courts of appeals, as explicitly contemplated by § 1818(h)(2). *Elgin*, 567 U.S. at 10.

### D.

Finally, we turn to *FDIC v. Bank of Coushatta*, 930 F.2d 1122 (5th Cir. 1991), in which we implied that § 1818 does not preclude jurisdiction for constitutional claims, albeit in dicta. There, the parties took opposite postures from this matter: the FDIC issued a capital directive to a bank. When the bank failed to comply, the FDIC brought an action in federal district court seeking enforcement. *Id.* at 1124. The bank alleged that due process required an administrative hearing within the agency and then judicial review after that hearing was complete. *Id.* In other words, the bank claimed that it was unconstitutional to *deprive* it of an in-house proceeding, the opposite of Burgess's position. We affirmed the district court's enforcement of the directive without a prior administrative hearing. *Id.* In doing so, we considered whether a capital directive is subject to judicial review under the language of the APA, or whether it constitutes an agency action committed to agency discretion. *Id.* at 1127.

*Coushatta* represents an obviously distinguishable posture and fact pattern from Burgess's case, but we discuss it because, just two years ago in *Collins v. Department of the Treasury*, 83 F.4th 970 (5th Cir. 2023), we framed *Coushatta* in a way that invites ambiguity on the question of jurisdictional preclusion. *See id.* at 980–81, 980 n.7 (5th Cir. 2023). To harmonize these cases, we begin with the *Coushatta* language itself before turning to how *Collins* interpreted it. The *Coushatta* court stated in relevant part:

> As discussed in *Webster*, even if agency action is committed to
> its discretion by law, judicial review of constitutional claims is

> still available, unless congressional intent to preclude such review is clear. We do not find such intent. Moreover, the FDIC concedes that unreviewability [sic] does not extend to the issue of whether there is a 'constitutional right to a full hearing on the record prior to issuance of a directive,' and instead asserts that the procedures provide due process.

*Coushatta*, 930 F.2d at 1129–30 (citing *Webster*, 486 U.S. at 603).

Notably, *Coushatta* was not squarely addressing jurisdictional preclusion the way we do today. The FDIC brought suit in federal district court to enforce its outstanding capital directive, an order that is issued pursuant to 12 U.S.C. § 3907 and enforced pursuant to § 1818(i) "to the same extent as an effective and outstanding order issued pursuant to section 1818(b) . . . which has become final." 12 U.S.C. § 3907(b)(2)(B)(ii); *see also* § 1818(b) (governing cease-and-desist proceedings). As discussed earlier, § 1818 enumerates several instances in which district court jurisdiction may be proper, including when the FDIC has issued a cease-and-desist order and seeks to enforce it. *See* § 1818(i)(1) (allowing the agency, in its discretion, to apply to federal district court for "the enforcement of any effective and outstanding notice or order issued under this section" and providing that such court "shall have jurisdiction and power to order and require compliance herewith"). *Coushatta* was therefore not engaging with the latter half of § 1818(i)(1) as we are today, because the FDIC sought district court jurisdiction to enforce an outstanding order, as expressly contemplated by the first clause of that provision.

Instead, the jurisdictional question in *Coushatta* involved § 701(a) of the APA. In *Coushatta*, the FDIC had argued that discretion to issue a capital directive is committed to it by law, implicating § 701(a)(2), much like in *Webster*. 930 F.2d at 1129. And, as excerpted above, the *Coushatta* court grounded its discussion of *Webster* in the world of § 701(a)(2)'s agency-

21

discretion, not in the world of jurisdictional-preclusion, found in § 701(a)(1) or elsewhere. 930 F.2d at 1129–30 ("As discussed in *Webster*, *even if agency action is committed to its discretion by law*, judicial review of constitutional claims is still available, unless congressional intent to preclude such review is clear." (emphasis added)). *Coushatta* is thus inapposite to the explicit jurisdictional preclusion question before us today.

Nevertheless, more than thirty years later, in 2023, and without citation to nor mention of the more-recent and more-on-point 2019 *Bank of Louisiana* opinion, in *Collins* we interpreted *Coushatta* as having held that § 1818(i)'s "language did not preclude review of constitutional claims," but we characterized it as nonbinding dicta. *Collins*, 83 F.4th at 980, 980 n.7.[10] We need not distinguish this nonbinding dicta to reach our holding today. *See United States v. Segura*, 747 F.3d 323, 328–29 (5th Cir. 2014) (disregarding nonbinding dictum and evaluating the topic anew); *United States v. Gieger*, 190 F.3d 661, 665 (5th Cir. 1999) (declining to follow unpersuasive dicta).

In any event, the rule of orderliness prevents one panel of this court from overruling a prior panel absent intervening change in law by either the Supreme Court or our en banc court, and we thus cannot read the *Collins* panel opinion as overruling the *Bank of Louisiana* panel opinion.[11] *See Cent.*

---

[10] *Collins* has an extensive history with numerous appeals and remands, and this particular opinion resulted from a remand to the district court "for the limited purpose of determining whether [the] unconstitutional removal restriction caused plaintiffs' harm." *Collins*, 83 F.4th at 975. The plaintiffs had sought injunctive relief, but the government claimed that the Housing and Economic Recovery Act of 2008's anti-injunction clause precluded judicial review. *Id.* at 979. While we found the clause barred the plaintiffs' APA claim, we held that the plaintiffs' constitutional claim could proceed because the anti-injunction clause did not explicitly preclude such claims. *Id.* at 980.

[11] Nor can we read *Bank of Louisiana* as overruling *Coushatta*, since *Coushatta* did not address explicit jurisdictional preclusion—it involved a situation where the FDIC availed itself of § 1818's explicit *permission* to seek enforcement of an outstanding order in federal district court. *See* 930 F.2d at 1125–27; *see also* 12 U.S.C. § 1818(i)(1) (providing

No. 22-11172

*Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001) ("It is well-established in this circuit that one panel of this Court may not overrule another.").

## IV.

We hold that 12 U.S.C. § 1818(i)(1) explicitly precludes district court jurisdiction to enjoin the FDIC's issuance of its final order. We REVERSE the grant of the preliminary injunction and REMAND with instructions to DISMISS for lack of subject matter jurisdiction.

Accordingly, all outstanding motions are DENIED AS MOOT.

---

that the FDIC "may in its discretion apply to . . . district court . . . for the enforcement of any effective and outstanding notice or order issued under this section"). The *Bank of Louisiana* court cited to *Coushatta* only once—to support its description of the FDIC's regulatory tools. 919 F.3d at 919. The en banc *Cochran* court, in clarifying the *Bank of Louisiana* holding, does not cite to *Coushatta* at all. *See generally* 20 F.4th at 194–250 (containing no citations or discussion of *Coushatta*, even in dissent). *Coushatta* is thus no obstacle to reaching our holding today.